This is in re the detention of Donald Stewart, 4-10-0-0-1-3. We have for the appellant, James Kuehl. Kuehl. And for the appellee, Carl Trevel. And we apologize for the delay in starting. We have been engaged in a judge's meeting with some serious issues. Please proceed. Good afternoon. May it please the court, counsel. My name is Jim Kuehl again, and I am the attorney for appellant Donald Stewart. In our brief, we raised three issues. The first one I will deal with today. The second is a Frye issue, where we argue that the trial judge should have looked at the static 99-R in a Frye hearing. The static 99 has been used for years in cases like this. It has been updated to a static 99-R. The static 99 has passed Frye-Muster, but the static 99-R, being so new, has not been examined, as far as we know, at least at the time of this trial. And we think those points are valid. The judge erred in not applying the Frye standard to 99-R and excluding it from evidence because it's so new. Counsel, let me stop you there. Doesn't the record show that trial counsel specifically said that a Frye hearing was not being requested? He did. Doesn't that pretty much take care of or resolve the issue? Yes. I think trial counsel also erred when he said that, along with the judge. But what trial counsel was asking for, in effect, was a Frye hearing. For him to say, I'm not looking for a Frye hearing, but I want you to exclude this as a motion in limine based on Frye, I think is still a Frye hearing. But certainly that's a good point. I think the issue would be clearer if the trial counsel had said, I'm asking for a Frye hearing instead of a motion in limine with Frye overtones. But I still think it's a Frye issue. Okay. How new is this version of the test? Boy, I don't know. The first time I heard about it was when I read the transcript in this case a few months ago. So the New York court had only considered it this year. The New York trial court that trial counsel used as authority, not this year, last year. Well, I know I certainly dissented in a few of these cases where I said that some of these tests should have been subjected to a Frye hearing. And I think the Supreme Court has consistently said that these types of tests are regularly used and they're commonly accepted without a Frye hearing. Well, our argument is the 99R was so new that it hadn't been reviewed by anybody, including courts. And it should have been. And the court should have at least considered using the, because the Frye standard is the Illinois standard, I don't know what other way the trial court could have looked at a motion in limine or any other motion regarding the static 99R. So that's the point. It should have been looked at. It wasn't. We think that's a valid point. And you say that the static 99R is just an updated static 99? As I understand it, yes. Well, why wouldn't we then apply the case law pertaining to Frye as it's developed on static 99? Well, a reviewing court might very well do that. The point is that the trial court didn't do anything, just rejected the motion in limine. And so we have no record of even some guidance whether he thought it, the trial court thought it met the Frye standard or didn't. So it's hard to review at this point. And our point is merely that he should have looked at it. Of course, we think it should have been excluded, but at least he should have looked at it through the Frye prism. A more contentious issue than I thought. And I don't mean to diminish it by focusing on the first issue. The third issue we raised has to do with the nexus between the mental illness and the behavior and the future dangerousness and those kinds of issues. I raise those in every appeal I've done on these kinds of cases. And I realize the hope in that argument is somewhat forlorn. We have not briefed it, but the recent U.S. Supreme Court case, U.S. v. Comstock et al. would probably deal with the issues that I've raised in my third issue. And of course, in that case, the Supreme Court has upheld the constitutionality of a very similar law in the federal court, similar to the Illinois law. But nevertheless, the courts consistently go with actuarial interpretations rather than looking at the individual themselves, their mental illness and possible future dangerousness based on that. And our position is that the statute requires some connection between the mental illness and the propensity then to commit further types of crimes and not an actuarial review based on percentages of large groups of people. What concerned me and the reason I asked for oral argument in this particular case is the first point we raised having to do with the appointed doctor, Dr. Jekyll, asking for assistance in his opinion evaluating Donald Stewart. The court rejected Dr. Jekyll's request made through trial counsel for Mr. Stewart for assistance in the form of not a psychiatrist, but a psychologist who deals with these actuarial static 99, static 99R, and all the other actuarials. Because Dr. Jekyll is not an expert in those areas and he found himself with an opinion that Mr. Stewart was not or does not fit the definition of a sexually violent person under the Act. In his affidavit he indicates his opinion would be more complete. And as I pointed out in the brief, things are either complete or they're not. I don't know how it could be more complete. But I think that's just code for Dr. Jekyll saying he needs some assistance in these other areas where he's not an expert. The court rejected the request for funds for the second expert, I should say. The court is always careful to say you can hire as many experts as you want, but of course Mr. Stewart is indigent and couldn't hire even one. But in this particular case where Dr. Jekyll, who is a psychiatrist and not a psychologist, requests it, the trial court said, well, a couple things. One, in raid detention of Allen says it's my discretion and generally we don't provide funds for multiple experts in these cases. But more than that, you already have a competent expert. He's obviously ready, willing, and able to testify. So your rights are not being abridged, Mr. Stewart, by denying Dr. Jekyll's request. Our position is quite different and it is concerning. Dr. Jekyll, who is well regarded in Champaign County, he's the go-to guy on at least the mental commitment cases. Dr. Jekyll was the first forensic scientist thought of by the trial court. It was the trial court originally who suggested Dr. Jekyll. Trial counsel agreed almost immediately. Dr. Jekyll is well known in Champaign County. And the reason we point that out, this isn't a case where the defense attorney went hunting for a favorable witness. This is a case where the court first suggested Dr. Jekyll and everybody agreed. When Dr. Jekyll examined Mr. Stewart and found that, in Dr. Jekyll's opinion, he didn't fit the definition of SVP, Dr. Jekyll then, it wasn't the defendant's, I should say, respondent's, desire to have another expert. It was Dr. Jekyll's desire. So this particular case is not like In re Allen at all. Well, I shouldn't say at all, but it's not like In re Allen. In re the detention of Allen. Allen had asked for two experts, got only one, and complained and said, well, they have two, why can't I have two? And the appellate court in that case said, well, it's not quantity, it's quality. There are other methods of balancing two against one, things like that. So if the trial court wants to give you a second expert, that's fine, but it is not required and it is not unconstitutionally, it does not unconstitutionally deprive you of your ability to present a defense if we deny the second expert. This is a case where the expert has said, I need some assistance in this particular case. I'm trying to think of an analogy. What was your client prejudiced by the denial? I mean, the expert testified in the defendant's favor. He couldn't have testified in his favor again. Well, two things. First, I believe the trial court substituted their judgment or his judgment for Dr. Jekyll's and said, well, you don't need any help. You're a competent psychiatrist. So if you say you need help, why should I listen to you? But he didn't say he couldn't render an opinion, did he? No, he didn't say he couldn't render an opinion, but Dr. Jekyll is saying to the court, I need extra help. It's as if he was a brain surgeon and he wanted a second opinion from another doctor or he wanted an MRI from whoever gives MRIs. I can't render an opinion that's complete unless I have this extra help in an area where I am not an expert. That's what Dr. Jekyll is saying. Wasn't Dr. Jekyll really saying he wants to make sure he's right, which would mean he wants to have testing done that might have been to your prejudice? Once again, that could be. But it was Dr. Jekyll. He was the expert. He was the expert recognized both by the defendant and the court. And he was saying, I need extra assistance. It may have meant more testing. I don't know. The record is silent on that point. But where it isn't silent is where Dr. Jekyll said, I need more help. And the court said, one, well, I don't think you do. And because I don't think you do, therefore, I'm not depriving the respondent of his rights by denying you the help. What happened, and I realize harmless error is floating around here because Dr. Jekyll did testify. But because he wasn't an expert in actuarials, he really couldn't discuss them. I think the state in their brief point out, well, gee, his opinion excluded pedophilia. And therefore, what difference does it make what the actuarials were? And, you know, that's kind of true. But the problem is that Dr. Jekyll could, because he's not an expert, couldn't explain why his opinion was superior to the other opinions and explain it by discussing the actuarials. It's not his area. The other problem in terms of harmless error is that the motion in limine by the state forbidding Dr. Jekyll to talk about his inability to do this and the court turning it down meant that the state couldn't really go into it either. If they had gone into it, the court had ruled, well, if you go into it, you're opening the door and I'm going to let them tell the jury that he wasn't allowed to get that extra help. So what happened was the state was allowed to present all this flashy science, actuarials, and the defendant was unable to counteract that with testimony except that the fairly abstract argument, well, since he's not a pedophile, all the testimony that he's bound to repeat his behavior doesn't really mean anything because that's not relevant because he's not a pedophiliac or whatever they're called. Stewart was unable to counteract that very powerful evidence from the state. And the state, just by remaining silent on the subject, kind of finessed Dr. Jekyll and he couldn't talk about actuarials and open the door. So the denial of the extra help from a psychologist for Dr. Jekyll was not harmless for Stewart. He was unable to attack with his own expert or with any testimony the testimony of the other two experts that he was likely to repeat his behavior. And that is not a harmless error. That was a major part of the trial. So because of that, it is our position that the trial court erred by substituting the trial court's own opinion of whether Dr. Jekyll needed help or not, saying, well, I don't think you do because you're so qualified. And there was actually... So the additional expert, if I understand your argument, was needed to refute what the two experts for the state said? Because I thought it was for some way to assist Dr. Jekyll. Yes. Dr. Jekyll never said, I want assistance for the following five reasons. But my assumption is that the psychologist that he was asking for was somebody who was an expert in actuarials. And so Dr. Jekyll would have consulted him on those points and modified his opinion accordingly, if necessary, or maintained his opinion and been able to undergo cross-examination. So Dr. Prozell would have assisted Dr. Jekyll in getting his report more complete, but he would not have himself become a witness? I'm not saying that. Prozell might very well have become a witness, yes. In fact, I think it's highly likely that he would have been a witness. But it was essentially your argument that because the state gets two experts, so should your client? No, let's say Dr. Prozell had started out, came to the same opinion, and he could have testified, but he could also have dealt with the actuarial evidence. I know the court in Allen thought, gee, all you have to do is cross-examine an expert, it balances the field. But usually the best way to counteract expert testimony is with your own expert testimony. Very few experts stop and say, you know, you're right, I'm absolutely wrong in this whole thing, and I'm terribly sorry that I wrote that opinion. You have to have somebody who knows something about it to counteract it. And Dr. Jekyll gave an opinion as to pedophilia, but as to actuarials, that's not his department. That's why he was apparently asking for the help. By being denied the help, there's a big, big hole in the defense. I don't know what this light means, but it's something bad, I'm sure. It means your time is almost up. It's when the red light goes on. Well, I will stand on the brief on the other two points, and that's my presentation on the first point, unless there are any other questions. No, we'll hear from you on rebuttal. Thank you. Good afternoon, Your Honors. Carl Schriebel representing the people of Illinois. First, I want to get an answer. Why is it fair for the state to get two experts and for the respondent to only get one? The court dealt with that question, Your Honor, in Ray Allen. And the answer is because the statute requires that the state be able to put on the two experts that it used in evaluating whether or not the respondent was an SVP. It's a two-step process under the statute. The statute requires that someone with IDOC do an initial screening to determine if there's probable cause to believe that the person is an SVP. And then the act also provides that someone from DHS examine the person as well in preparation for the SVP trial. So that's why the state has two experts. And we know from in Ray Allen that there's no constitutional requirement that the respondents in these cases receive an equal number of experts. Is there an advantage to having two experts as compared to the respondent having only one expert? According to in Ray Allen, there's no significant benefit to the state to the point where courts are required to give a second expert to the respondent. Wouldn't you think it would be a good exercise of discretion by the court to even up the number of experts? Your Honor, I don't know. It's not my place to put myself in the trial court's shoes. What I do know is that both parties agree this is an abuse of discretion standard. And the only thing given to the trial court in the form of a request from Dr. Jekyll in this case was on page C34 of the record. And if the court examines that document, it's an affidavit with only three points. And the doctor only tells the court that he has a pending evaluation and report that he believes would be quote, much more complete if he had the benefit of additional information in the evaluation and analysis of a specific psychologist, Dr. Luis Rizal of Mount Pleasant, Iowa. Again, that's on page C34. So the trial court was only presented with that affidavit. It was never told to the trial court, well, Dr. Jekyll's not an expert in actuarial instruments. That's on page 12 of the respondent's brief before this court. And it was also presented to the trial court in the form of the attorney's motion for funds for a second expert. But it was never presented to the court in any affidavit or testimony from Dr. Jekyll himself. So that's just pure speculation. The reviewing courts should look to what were the facts presented to the trial court in evaluating a discretion review. And here, it can't be an abuse of discretion for a trial court to deny funds for a second expert where the first expert doesn't state anywhere that he's unable to complete his evaluation for any specific reason. Just stating that a report would be much more complete is not sufficient to say that the trial court has abused his discretion. The trial court was even presented from argument from respondent's counsel before deciding. This is on the record, volume 4, page 9 and 10. And here, counsel merely argued to the trial court that they were not asking for a second opinion, but that Dr. Jekyll simply believed his report could be benefited by the second opinion of a psychologist and it would be more beneficial to his report. Again, that doesn't argue to the trial court any specific rationale as to why Dr. Jekyll wanted this specific psychologist's opinion. It merely states that he wanted it. So it's true that there was a motion in Lemonet to not go into the discussion of the court's ruling on this issue before the jury, but that isn't the question under review. The question under review is whether or not the trial court's ruling at this time, at the pretrial stage, was an abuse of discretion. The only facts, again, presented to it were that doing so would make his report more complete or be more beneficial. And it simply couldn't be an abuse of discretion for a trial court to deny such a motion when there's no actual facts. It would be a different case if Dr. Jekyll had specifically said, I'm lacking in these three areas or in these four areas and my report won't go into those areas and I feel that they're important to an SVP case. Then we would be presented with completely different facts. Those facts are not presented here and therefore it can't be an abuse of discretion. And moreover, even if this court disagreed with that proposition, it would be harmless in this case where Dr. Jekyll did present a complete report and did go into all three aspects of whether or not the respondent had a mental illness, whether or not the diagnosis by the people's experts was correct, whether or not he had the volition to control himself, and whether or not he was substantially more likely, based on that mental illness, to commit future acts of sexual violence. I also wanted to answer one question that Your Honor started off with regarding the actuarial instruments. The Static 99 revision took place according to the New York court, their factual findings. It took place in February of 1999 and that's consistent with Dr. Quackenbush's testimony in this case and Dr. Gaskell's testimony. They both testified about the revisions that were made to the Static 99  So they were all made, I'm not certain of the specific date, but Dr. Gaskell and Dr. Quackenbush stated that they took place within a year prior to the start of this trial to the point where Dr. Quackenbush didn't even evaluate the revised version of the Static 99. He relied only on the Static 99 itself. Dr. Gaskell was the only expert that went into the revised form. And here, this issue is governed... I just want to make sure I didn't write this down wrong. You said the 99R was revised in February of 1999? That's what I wrote down. It's on the Rosado opinion, page 376 and 77, but I may have written it down wrong. Let me just double check that. But they said the revisions were made to it in 99. And what's the date of the Rosado opinion? The Rosado opinion was 2009. I'm sorry, it's not 1999, I just skipped a decade. It's February of 2009, which makes more sense. So the revision was made in the year prior to the trial in this case. But again, this issue is controlled by Simons. Simons didn't limit itself to saying, we're ruling that the Minnesota test and that the Static 99, the older version, are admissible in a court of law. What Simons held was that actuarial instruments in general are admissible. And indeed, the reasoning that they applied in that case would apply equally here. What they said is that Fry only demands a hearing where the scientific methodology is, quote, considered new or novel in that it is original or striking and does not resemble something formerly known or used. And that's on page 1189 of the Northeastern Reporter of Simons. And what the court is getting at there is that actuarial instruments have been around for a long time. New versions tend to crop up. Static 99 will crop up or a Minnesota version will come up. And in this case, the Static 99 revision just came up. But they're not subject to Fry testing where they're not something that's original and they're not something that doesn't resemble something formerly known or used. So in other words, the Static 99R is just a revision of the Static 99. It can't be said that it doesn't resemble something formerly used. And under Simons, there would be no need to conduct a Fry hearing in this case. And indeed, Simons held that Fry hearings are not needed in the case of the Static 99 or in the case of the Minnesota test. What they said is that actuarial instruments in general don't require a Fry test because they believe that these have gained a general acceptance in the field. Very quickly, Your Honor, I also want to touch on the third issue, which is the jury instruction point. In Respondent's reply brief, he concedes that his proposed jury instructions could be described as redundant. On page C180 of the record, we have the jury instructions that were given where it says, a mental disorder means a congenital or acquired condition affecting the emotional or volitional capacity that predisposes a person to engage in acts of sexual violence. So volitional capacity was presented to the jury. And it can't be an abuse of discretion to fail to adopt what Respondent concedes is a redundant jury instruction. Unless the Court has any further questions, the people will rest on the points presented in their brief and ask the Court to affirm the trial court's decision. Thank you, counsel. No further questions. Mr. Keough, rebuttal. Thank you, Your Honor. I think in Simmons, the Court there ruled that actuarials meet the Frye Standard because they meet the Frye Standard and have met the Frye Standard in other jurisdictions for a long time. The only jurisdiction that we know of that has reviewed the static 99R is the lowly trial court in New York, which rejected the static 99R. So using the Simmons standard, we still should have had a Frye hearing on the static 99. And counsel made a similar mistake that I did. I said the static 99R came out a few months ago. It was last year, so my mistake. In re Allen doesn't require the Court or the State through the Court to pay for two experts. But in re Allen also stands for the proposition that SDP defendants still are required to have the same basic rights as everyone else and a right to a fair trial. In re the detention of Allen just concluded that providing two experts at State expense wasn't necessary to preserve those rights. One expert was good enough, and if the defendant wanted to hire more, that's fine. But in re Allen does not stand for the proposition that a defendant is not entitled to present an effective defense. And that's our point, is that because Dr. Jekyll was unable to have the extra help, the trial counsel and the defendant were unable to present an effective defense. Yes, the presentation to the trial court regarding the need for extra help was kind of in code. But it is not a trivial point that the trial court first thought of Dr. Jekyll when he thought of expert in this field. And it was readily agreed to by the trial counsel. If Dr. Jekyll is thought of, if he's the first guy you think of, and he comes back and says, I need some additional help, we feel it's an abuse of discretion for the trial court to substitute his opinion. Well, you're good enough. I don't see why you need extra help. I don't think it's a violation and a deprivation not to give you that help. You can hire him if you want, but we're not going to pay for it, obviously. Mr. Stewart was in no position to pay for it. So while Dr. Jekyll may be talking in psychiatric code to the court, still the request is plain. Here's an expert, highly regarded by the court and counsel, who's asking for help. And the court denied that help. It did lead to consequences at the trial regarding meeting the challenge of the actuarials presented by the state, not harmless error, so we're asking that this court reverse the, I don't want to say conviction, the judgment of the jury and grant him a new trial. Counsel, are you privately retained? No, I'm appointed. As was Mr. Silkwood, who was the trial counsel. Thank you very much. We'll take this matter under a...